[No. 52139-5. En Banc. June 12, 1986.]

ROBERT B. CLARKE, *Appellant*, v. SHORELINE SCHOOL DISTRICT No. 412, *Respondent*.

*Cogdill, Deno, Millikan & Carter,* by *Kent Millikan* and *W. Mitchell Cogdill,* for appellant.

*Keough & Mallett,* by *John J. Keough,* for respondent.

PEARSON, J.—Appellant Robert Clarke, a teacher of severely mentally retarded children for respondent Shoreline School District, was discharged from employment after serving a period of probation. Robert Clarke is legally blind and wears bilateral hearing aids for a hearing impairment.

Clarke claims he was discharged because of his handicap, in violation of the Law Against Discrimination, RCW 49.60, and, regardless, that the School District failed to comply with the statutory requirements pertaining to teacher probation. In an administrative hearing, the hearing officer found that the District discharged Clarke for sufficient cause, a decision affirmed on appeal by the King County Superior Court. Clarke appealed to the Court of Appeals, which transferred the case to this court pursuant to RAP 4.3. We affirm.

I

Robert Clarke graduated from the University of Washington in 1949 with a bachelor's degree in physical education, and obtained his teacher's certification the following year. Between 1951 and 1965, he had teaching experience as a substitute teacher for 3 weeks, and as a full-time teacher for 1 year at a now defunct private school. He has taken approximately 6 credit hours of continuing education in special education since graduating from college. Otherwise, he has no other special education training or, for that matter, any formal training in any other curricular subject.

Clarke began teaching for the School District in 1965. He taught at the Fircrest School continuously during the next 13 years, except for a 1-year venture in real estate in the 1969–70 school year. During his career with the School District, he taught severely and profoundly handicapped, special education students. The class sizes averaged about 10 students, with each class having one teacher and an average of two instructional assistants.

Since 1960, Clarke has suffered from a degenerative eye disease known as *retinitis pigmentosa,* which involves the gradual narrowing of his peripheral vision. At the time he was discharged in 1978, his vision had degenerated to the point that he only had a narrow range of vision directly in front of his eyes; even that vision was somewhat clouded. Clarke also suffers from a bilateral hearing loss which he has had since college. This hearing impairment, however, is

largely compensated by two hearing aids which enable him to hear normal speech, except at higher frequencies.

Clarke first noticed his vision deficiency about 1970; but it did not become a significant problem until the 1973–74 school year. His loss of eyesight eventually impaired his ability to carry out his teaching duties, particularly in monitoring student location and behavior in the classroom, in seeing responses to verbal commands to the students, in recording information on student behavior, and in preparing for class. These difficulties gradually increased as his peripheral vision decreased during the ensuing 5 years.

Pat Shiveley was designated by the School District to serve as the administrator of the Fircrest program. As the Fircrest administrator, Shiveley was responsible for performing Clarke's statutorily required observations and evaluations. Clarke's gradual loss of vision and accompanying classroom difficulties were the only concerns noted by Shiveley in the annual evaluations in 1973–74 and 1974–75. Shiveley completed her last, formal end–of–year evaluation of Clarke on May 20, 1976. As a result of Clarke's vision and hearing problems, Shiveley was unable to recommend Clarke's continued classroom assignment at Fircrest.

About the time Shiveley completed her 1975–76 evaluation of Clarke, Clarke attended a conference with James Becker, Director of Pupil Services, and Gerry Alexander of the State Services for the Blind. At that conference, the three men discussed both Clarke's hearing and vision disabilities and his teaching deficiencies. To remedy both the teaching deficiencies and the vision handicap, four possible alternative courses of action were identified. The obligation was on Clarke to select a course of action and notify the School District of that course of action. At no time did Clarke select one of the alternatives set forth at the conference or notify the School District, through Mr. Becker, of his selection.

Because of his vision problems, Clarke requested an intradistrict transfer in December 1975, and again in the summer of 1976. The District refused these requests. A

request for an additional aide to assist him in the classroom likewise was refused.

In a letter dated September 20, 1976, William G. Stevenson, Superintendent of Shoreline Public Schools, placed Clarke on probationary status for the 1976–77 school year. The notice of probation specified three areas of professional performance deficits:

1. Failure to adequately handle student discipline and attendant problems of student conduct, and the general safety and welfare of students assigned to the classroom.

2. Deficiency in professional preparation in establishing long and short range lesson plans as required by school district policy and building procedures.

3. Failure to establish educational objectives appropriate for handicapped students with the accompanying need to select and implement teaching methods that would meet the educational abilities of handicapped students.

The Superintendent's notice of probation also proposed a plan to remediate the teaching deficiencies.

Clarke subsequently filed a complaint with the Washington State Human Rights Commission, alleging that the School District was not making an effort to reasonably accommodate his handicaps as required by state law. As a result of that complaint, the Commission initiated an investigation which resulted in a Pre–Determination Settlement Agreement between the School District, Clarke and the Human Rights Commission on February 7, 1977.

That agreement provided, in part, that (1) Clarke would be able to take a disability leave of absence beginning in February 1977, for the purpose of *"rehabilitation"* and *"retraining"*;[1] (2) all data regarding the 1976–77 probation-

---

[1]As found by the hearing officer, the terms "rehabilitation" and "retraining" were understood by the parties to mean "(a) rehabilitation: services primarily directed towards appellant's dealing with his handicapping condition in his daily life activities, including such things as self–help skills of daily living, orientation and mobility, and industrial arts; (b) retraining: professional instruction and assistance for appellant to provide him with the necessary teaching techniques to allow him to continue teaching as a blind individual."

ary period would be destroyed; (3) when he returned to teach the following September, the School District would reasonably accommodate any remaining limitation of function which was not overcome through the rehabilitation and training; (4) Clarke would return to teaching in September 1977, on probation, and (5) if he failed his probation, the School District would make reasonable effort to transfer Clarke to another position in the School District on the same basis as it would other teachers who had failed probation.

Clarke did enroll in general rehabilitation programs offered by the State Services for the Blind during his leave of absence. During that time, he also observed other blind teachers' techniques. Clarke had planned to enroll in a training course for blind teachers, but that course was not offered during his leave of absence. In short, although he received some *rehabilitation,* Clarke obtained little or no *retraining* to allow him to more effectively serve as a blind teacher of the severely retarded.

Clarke returned to his teaching duties at the beginning of the 1977–78 school year on probation, and Shiveley was assigned to observe and evaluate his progress during the probationary period. Initially, Clarke was assigned a class of nine students, four of whom were blind and four of whom were serious behavior problem students. Clarke protested to Shiveley during that school year that the number of behavior problem students, together with the blind students, presented substantial additional problems for him as a result of his handicaps.

As found by the hearing officer, however, the classroom to which Clarke returned for the 1977–78 school year contained children who were specifically chosen with both his teaching deficiencies and sensory handicaps in mind. In addition, specially chosen instructional assistants were assigned to Clarke. Clarke also was given special consideration in the assignment of the classroom in which his students were to be taught.

Clarke requested further accommodations from the

School District, including an additional instructional assistant, and either fewer students or fewer behavior problem students. The District denied these requests and later added two more behavior problem students to Clarke's class over his protests and protests from his two instructional assistants.

In April 1978, Clarke again wrote to the District Superintendent requesting either an additional instructional assistant and fewer behavior problem students, or a transfer to some other position for which he was more suited. Apparently it is the District's policy not to transfer persons who are currently in a probationary status with the District. On both occasions when appellant made a formal written request for transfer, he was on probation with the School District.

On May 11, 1978, the Superintendent notified Clarke that the District was discharging him from his employment as of May 15, 1978, and also that it did not intend to renew his contract for the following school year. According to the Superintendent, he had determined that "sufficient cause" existed for discharge or nonrenewal of Clarke's contract for the causes listed as follows:

1. You have failed to adequately handle student discipline and attendant problems of student conduct and the general safety and welfare of students assigned to your classroom.

2. You have been deficient in professional preparation in establishing long and short range lesson plans as required by school district policy and building procedures.

3. You have failed to establish educational objectives appropriate for handicapped students with the accompanying need to select and implement teaching methods that will meet the educational abilities of handicapped students.

4. You constitute a hazard to the welfare and safety of students under your charge as a teacher at Fircrest School.

Clarke appealed his discharge and nonrenewal pursuant to the appeal statutes. A hearing was held before a desig-

nated hearing officer for a determination, de novo, as to whether there was sufficient cause for his discharge. The hearing officer ruled that there was sufficient cause to discharge Clarke from his employment with the School District.

## II

On appeal to the Superior Court, the trial court entered a conclusion of law that the "clearly erroneous" standard of judicial review applied in determining whether the hearing officer's findings of fact established sufficient cause for Clarke's discharge. Clarke contends the trial court erred in concluding that the clearly erroneous standard applies. According to Clarke, the correct standard of judicial review on the issue of sufficient cause is de novo review, because the issue is one of mixed law and fact.

The scope of this court's review is prescribed by RCW 28A.58.480. *Pryse v. Yakima Sch. Dist. 7,* 30 Wn. App. 16, 21, 632 P.2d 60, *review denied,* 96 Wn.2d 1011 (1981). The standards of review prescribed by RCW 28A-.58.480 are identical to those prescribed by RCW 34.04-.130(6), part of Washington's administrative procedure act. Therefore, Washington courts construe RCW 28A.58.480 consistent with the administrative procedure act. *See Pryse,* at 21.

Under RCW 28A.58.480(5), a court reviewing the factual determinations of a hearing officer inquires whether those determinations are "clearly erroneous". *See Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 324–25, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983); *Pryse,* 30 Wn. App. at 21–23. Issues of law are reviewed de novo. In other words, under the error of law standard, the reviewing court may determine "what the law is". *Sellers,* at 325–26; *Potter v. Kalama Pub. Sch. Dist. 402,* 31 Wn. App. 838, 840, 644 P.2d 1229 (1982); *Adams v. Clover Park Sch. Dist. 400,* 29 Wn. App. 523, 525, 629 P.2d 1336 (1981). When reviewing the application of the law to the facts, a reviewing court makes a de novo determination of the applicable

law, but gives deference to the hearing officer's factual determinations, reviewing them under the "clearly erroneous" standard. *See Sellers,* at 329–30.

As this court stated in *Sellers,* "it is not the province of the reviewing court to try the facts de novo when presented with mixed questions of law and fact . . ." *Sellers,* at 330. Accordingly, the Superior Court was bound to affirm the factual findings of the hearing officer, unless they were clearly erroneous, but was free to determine the correct law independent of the hearing officer's decision and apply it to the facts as found by the hearing officer. Likewise, we are bound by the same standard of review in resolving this appeal.

Whether a teacher actually engaged in certain conduct or was deficient in his practices or methods clearly is a factual question. Accordingly, a hearing officer's findings of fact on such matters should not be disturbed unless clearly erroneous. *Sellers,* at 324–25. However, a determination that "sufficient cause" for a teacher's discharge exists is a legal conclusion required by statute, RCW 28A.58.099, and defined by case law. *See Hoagland v. Mount Vernon Sch. Dist. 320,* 95 Wn.2d 424, 428, 623 P.2d 1156 (1981). Accordingly, a hearing officer's conclusion of law as to the definition of sufficient cause should not be disturbed unless it constitutes an error of law. *Sellers,* at 325–26.

The question of whether specific conduct, practices or methods constitute sufficient cause for discharge is one of mixed law and fact, *i.e.,* there is a question as to the propriety of the inferences drawn by the hearing officer from the raw facts, and as to the meaning of the statutory term. *Sellers,* at 330. A court reviews such issues de novo, meaning the reviewing court determines the correct law and applies it to the facts as found by the hearing officer. *Sellers,* at 330.

Given this construct, the trial court erred in enunciating the appropriate standard of review. Although the court correctly noted that findings of fact are to be reviewed under the clearly erroneous standard, it apparently concluded

that the issue of sufficient cause was one of fact, when actually it is one of mixed law and fact, subject to de novo review. *Sargent v. Selah Sch. Dist. 119*, 23 Wn. App. 916, 919, 599 P.2d 25 ("the question of sufficient cause for discharge raises a question of mixed law and fact, *i.e.*, there is a dispute both as to the propriety of the inferences drawn by the hearing officer from the raw facts and as to the meaning of the statutory term, sufficient cause"), *review denied*, 92 Wn.2d 1038 (1979). In our capacity as a reviewing court, we must give deference to the hearing officer's findings of fact, but are free to determine the correct law and apply it to the facts as found by the hearing officer.

### III

One of the principal reasons for discharge given by the Superintendent in Clarke's notice of discharge and nonrenewal was that Clarke constituted "a hazard to the welfare and safety of students under [his] charge". As found by the hearing officer, this deficiency in Clarke's performance was attributable to his handicaps.[2] Nevertheless, the hearing officer concluded that this reason alone constituted sufficient cause to discharge Clarke. This conclusion of law was

---

[2] In finding of fact 29(a)–(f), the hearing officer stated that the following "[d]eficiencies were also observed in appellant's performance that were attributable to his handicapping condition:

"a. [Clarke] was unable to adequately monitor the location of the students either within his classroom or during movement in the hallways.

"b. [Clarke] was unable to locate or retrieve educational materials used in his teaching activities.

"c. [Clarke] was unable to see the immediate responses of students to tasks he requested they complete which led to a subsequent failure to reward or sanction the child in an appropriate manner.

"d. Due to [Clarke's] vision difficulties, he was unable to move students in his classroom, around the classroom, or in the halls with safety, and at least one instance was observed where [Clarke] accidently pushed a student in a wheelchair into the doorjamb.

"e. Due to his vision disability, [Clarke] was unable to himself move through the class and hallways without often striking or tripping over the students, or other objects in his way.

"f. Due to the mechanical damping on [Clarke's] hearing aids, he was often unable to hear verbal warnings of dangerous situations given him by his instructional aides."

adopted and affirmed by the Superior Court.

This court first must determine whether the hearing officer's finding of fact that Clarke had teaching deficiencies due to his handicap was clearly erroneous. After reviewing the record, we conclude the hearing officer's finding of fact on this matter is supported by substantial evidence. Even Clarke's testimony at the hearing established that his visual handicap and hearing impairment affected the safety of the students in his charge. The hearing officer was presented with sufficient evidence that Clarke was a hazard, and his finding on the issue is not clearly erroneous. Therefore, this court should give deference to that finding. *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 324–25, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983).

The more problematic task is to determine, de novo, whether the fact that Clarke was a hazard to student safety was sufficient cause for discharge as a matter of law. This task is particularly difficult given that this deficiency related to Clarke's handicap, thereby implicating Washington's Law Against Discrimination found in RCW 49.60.180. For ease of analysis, however, the impact of RCW 49.60.180 will be discussed below. For now, the focus of discussion is whether, as a matter of law, sufficient cause exists for discharge where a teacher constitutes a hazard to the health and welfare of his students. As discussed below, if sufficient cause for Clarke's discharge did exist as a matter of law, then the School District was not required to comply with the evaluation and probation requirements of RCW 28A-.67.065.

A teacher has no inherent right to public employment. *Williams v. Seattle Sch. Dist. 1,* 97 Wn.2d 215, 222, 643 P.2d 426 (1982). Pursuant to RCW 28A.58.099, however, "a teacher's employment contract includes a term by which, during the tenure of the contract, a teacher cannot be discharged without 'sufficient cause.'" *Simmons v. Vancouver Sch. Dist. 37,* 41 Wn. App. 365, 374–75, 704 P.2d 648 (citing *State ex rel. Board of Directors v. Preston,* 120 Wash. 569, 571, 208 P. 47 (1922)), *review denied,* 104 Wn.2d 1018

(1985). In determining whether sufficient cause for discharge exists, "[t]he thrust of the inquiry . . . is 'whether the teacher has so materially breached his promise to teach as to excuse the school district in its promise to employ.'" *Barnes v. Seattle Sch. Dist. 1,* 88 Wn.2d 483, 487, 563 P.2d 199 (1977) (quoting *Francisco v. Board of Directors,* 85 Wn.2d 575, 580, 537 P.2d 789 (1975)).

The term "sufficient cause" under RCW 28A.58.099 has been limited by court interpretation to prohibit discharge for a "remediable teaching deficiency", unless school authorities comply with the requirements of RCW 28A-.67.065(1). *See Wojt v. Chimacum Sch. Dist. 49,* 9 Wn. App. 857, 861–62, 516 P.2d 1099 (1973) (inability to maintain discipline and deficient teaching methods constitute remediable teaching deficiencies). In *Hoagland v. Mount Vernon Sch. Dist. 320,* 95 Wn.2d 424, 428, 623 P.2d 1156 (1981) this court interpreted "sufficient cause", in the context of a nonremediable teaching deficiency, to mean a showing of conduct "which materially and substantially affects the teacher's performance." *See also Simmons v. Vancouver Sch. Dist. 37, supra* at 379. Similarly, the Court of Appeals has upheld teacher dismissals where the conduct at issue lacked "any positive educational aspect or legitimate professional purpose." *Pryse v. Yakima Sch. Dist. 7,* 30 Wn. App. 16, 24, 632 P.2d 60, *review denied,* 96 Wn.2d 1011 (1981); *Potter v. Kalama Pub. Sch. Dist. 402,* 31 Wn. App. 838, 842, 644 P.2d 1229 (1982). This court recently has observed that, "in some instances, teacher misconduct can be so egregious that the sufficient cause determination can be made as a matter of law." *Mott v. Endicott Sch. Dist. 308,* 105 Wn.2d 199, 203, 713 P.2d 98 (1986). Even in these cases, however, the teacher is entitled to a hearing. *Hoagland,* at 428.

Read together, the general rule emanating from Washington case law is this: Sufficient cause for a teacher's discharge exists as a matter of law where the teacher's deficiency is unremediable and (1) materially and substantially affects the teacher's performance, *Hoagland,* at 428, *Mott,*

at 203; *or* (2) lacks any positive educational aspect or legitimate professional purpose. *Pryse,* at 24; *Potter,* at 842. In such cases, the teacher is deemed to have materially breached his promise to teach, *Barnes,* at 487, *Simmons,* at 378, and can be discharged without compliance with the probation procedures of RCW 28A.67.065. *Simmons,* at 377 (citing *Sargent v. Selah Sch. Dist. 119,* 23 Wn. App. 916, 924–25, 599 P.2d 25, *review denied,* 92 Wn.2d 1038 (1979); *Wojt,* 9 Wn. App. at 864.

 A common thread running through many Washington cases is a concern for the health, safety and welfare of the students. *Simmons,* at 377; *Potter,* at 841; *Pryse,* at 24. In *Hoagland v. Mount Vernon Sch. Dist. 320,* 95 Wn.2d 424, 429–30, 623 P.2d 1156 (1981), this court enunciated eight factors for consideration in teacher discharge cases because "[t]hey are obviously relevant to any determination of *teaching effectiveness,* the touchstone for all dismissals." (Italics ours.) Of the eight factors, two explicitly concern the students.

In determining whether a teacher's conduct substantially undermines his effectiveness, thereby justifying discharge, this court in *Hoagland* stated it would consider the propriety of the dismissal in light of:

> (1) the age and maturity of the *students*; (2) the likelihood the teacher's conduct will have adversely affected *students* or other teachers; (3) the degree of the anticipated adversity; (4) the proximity or remoteness in time of the conduct; (5) the extenuating or aggravating circumstances surrounding the conduct; (6) the likelihood that the conduct may be repeated; (7) the motives underlying the conduct; and (8) whether the conduct will have a chilling effect on the rights of the teachers . . .

(Citations omitted. Italics ours.) *Hoagland,* at 429–30.

At this juncture, two observations must be made. First, not all eight factors will be applicable in every teacher discharge case. Second, these factors are not necessarily applicable when the cause for dismissal is the teacher's improper performance of his duties. *Simmons,* 41 Wn. App. at 378–79. They were designed to ensure that "when a teacher's

status or conduct outside his profession is the basis for his dismissal, that cause is related to his performance of his duties as a teacher". *Simmons,* at 378 (citing *Hoagland,* at 428). Nevertheless, these factors are helpful in determining whether a teacher's effectiveness is impaired by his classroom deficiencies.

In this case, a deficiency constituting a hazard to the safety and welfare of Clarke's students would be sufficient cause for discharge as a matter of law if the deficiency materially and substantially affected Clarke's performance, *see Hoagland,* at 428, such that Clarke can be deemed to have materially breached his promise to teach. *See Barnes v. Seattle Sch. Dist. 1,* 88 Wn.2d 483, 487, 563 P.2d 199 (1977). In determining whether Clarke's deficiency materially and substantially affected his performance, we believe the eight factors articulated in *Hoagland* should be considered.

The first factor, "the age and maturity of the students", reflects the court's notion that the capacity of the students may be relevant to determining whether a particular deficiency substantially impairs a teacher's performance. In this case, the students involved are severely mentally retarded children, one of the most difficult groups to teach because of their severe physical handicaps and significant behavioral problems. Such children heavily depend upon their teacher for mobility, and require close monitoring by the teacher to prevent self–inflicted injury, as well as injury by one to another. In this already hazardous environment, the fact that Clarke constitutes a hazard himself clearly is relevant to determining his effectiveness as a teacher of severely mentally retarded children.

The second factor, "the likelihood the teacher's conduct will have adversely affected students or other teachers", clearly applies to this case. At the hearing, testimony revealed that children in Clarke's class had been adversely affected by his inability to monitor them and provide the mobility they require. Furthermore, testimony also revealed that Clarke's deficiency had substantially increased the

burden shouldered by his instructional assistants, making it difficult to obtain assistants for Clarke.

The third factor, "the degree of the anticipated adversity", is difficult to quantify. In a classroom of multiply handicapped children, one can only speculate about the degree to which they might be injured because of Clarke's deficiency. Suffice it to say that school authorities are not required to await disaster before intervening. With respect to the burden on Clarke's instructional assistants, the exact extent to which his deficiency made their jobs more difficult is unclear. There is evidence, however, that his former instructional assistants would be reluctant to work with Clarke again.

The fourth factor, "the proximity or remoteness in time of the conduct", does not appear to apply to this factual situation. The fifth factor, however, "the extenuating or aggravating circumstances surrounding the conduct", is relevant to the present inquiry. With respect to extenuating circumstances, it is impossible to fault a man for a deficiency caused by physical handicaps. On the other hand, with respect to aggravating circumstances, evidence at the hearing demonstrated that Clarke did not seek any rehabilitation until after he was legally blind, and only then after he signed the Pre-Determination Settlement Agreement requiring him to seek rehabilitation.

The sixth factor, "the likelihood that the conduct may be repeated", obviously is pertinent in determining Clarke's effectiveness as a teacher. His handicaps are not reversible as far as the record shows, so his existence as a hazard can be expected to be an ongoing problem. Even after he sought rehabilitation from the State Services for the Blind, Clarke's deficiency continued.

The seventh factor, "the motives underlying the conduct", and the eighth factor, "whether the conduct will have a chilling effect on the rights of the teachers", do not appear to be applicable to this case. Nevertheless, of the five factors that are pertinent to this case, an analysis of each lends support to the conclusion that Clarke's defi-

ciency materially and substantially affects his performance as a teacher. Accordingly, we hold that the School District had sufficient cause to discharge Clarke, regardless of whether it complied with the requirements of RCW 28A-.67.065.[3]

Lest there be any misunderstanding in the future, however, we believe compliance with RCW 28A.67.065 is the rule rather than the exception to the rule. Thus, school authorities should refrain from discharging a teacher as a matter of law, except in the most egregious cases, *see Mott v. Endicott Sch. Dist. 308,* 105 Wn.2d 199, 713 P.2d 98 (1986), especially where the teaching deficiency is related to a handicapping condition amenable to rehabilitation.

## IV

Although the School District was entitled to discharge Clarke as a matter of employment law, this court must determine whether his discharge violated Washington's Law Against Discrimination, RCW 49.60.180. RCW 49.60-.180(1) makes it an unfair practice for any employer "[t]o *refuse to hire* any person because of . . . the presence of any sensory, mental, or physical handicap . . ." (Italics ours.) Similarly, RCW 49.60.180(2) makes it an unfair practice for any employer "[t]o *discharge* . . . any person from employment because of . . . the presence of any sensory, mental, or physical handicap." (Italics ours.)

In the proviso appearing in subsection (1) of RCW 49.60-.180, however, "the prohibition against discrimination because of such handicap shall not apply if the particular disability prevents the *proper performance* of the particular worker involved." (Italics ours.) Although only appearing in subsection (1), the language of the proviso has been

---

[3]The Superior Court and the hearing officer ruled that the School District only was required to "substantially comply" with the evaluation and probation statute, RCW 28A.67.065, and that the School District did substantially comply with the statutory requirements. Clarke argues that "strict compliance" with RCW 28A.67.065 is required and that, regardless, the School District did not even substantially comply with the statute. Because we conclude that sufficient cause existed as a matter of law for Clarke's discharge, we need not address this issue.

applied by regulation to all cases arising under RCW 49.60-.180, including subsection (2), "where ability to do the job is *material.*" WAC 162–22–050(3). Accordingly, an employer may refuse to hire *or* may discharge a handicapped person, if the handicap prevents the "proper performance" of the job.

On the other hand, WAC 162–22–080(1) makes it an unfair practice for an employer "to fail or refuse to make *reasonable accommodations* to the sensory, mental, or physical limitations of employees . . ." (Italics ours.) The only exception to this rule exists where "the employer can demonstrate that such an accommodation would impose an *undue hardship* on the conduct of the employer's business." (Italics ours.) WAC 162–22–080(1). We must determine whether the District was obligated to make reasonable accommodations to Clarke's handicap.

This court has held that, when Washington statutes or regulations have the same purpose as their federal counterparts, we will look to federal decisions to determine the appropriate construction. *Fahn v. Cowlitz Cy.,* 93 Wn.2d 368, 376, 610 P.2d 857, 621 P.2d 1293 (1980).

Pursuant to 29 U.S.C. § 794, the federal counterpart to RCW 49.60.180, "[n]o otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap . . . be subjected to discrimination under any program . . . receiving Federal financial assistance . . ." In *Southeastern Comm'ty College v. Davis,* 442 U.S. 397, 406, 60 L. Ed. 2d 980, 99 S. Ct. 2361 (1979), the Supreme Court defined an "otherwise qualified person" as "one who is able to meet all of a program's requirements in spite of his handicap." According to the Court in *Davis,* 29 U.S.C. § 794 "does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate." *Davis,* at 405.

The key to understanding the Court's interpretation of § 794 lies in its statement that "mere possession of a handicap is not a permissible ground for assuming an inability to

function in a particular context." *Davis,* at 405. In other words, an employer cannot refuse to hire or discharge a handicapped employee simply because he is handicapped. On the other hand, no such prohibition exists if the handicap prevents performance of the "essential functions of the job". 45 C.F.R. § 84.3(k) (1985). *See Upshur v. Love,* 474 F. Supp. 332 (N.D. Cal. 1979); *Coleman v. Darden,* 595 F.2d 533 (10th Cir. 1979). We believe a similar construction applies to RCW 49.60.180.

 Under the statutory and regulatory construction propounded above, an employer may discharge a handicapped employee who is unable to perform an essential function of the job, without attempting to accommodate that deficiency. In this case, the Superintendent gave as one of the reasons for Clarke's discharge and nonrenewal the fact that Clarke constituted "a hazard to the welfare and safety of students under [Clarke's] charge . . ." As found by the hearing officer, this deficiency in Clarke's performance was attributable to his handicaps. Maintenance of the safety and welfare of retarded students clearly is an essential function of a teacher of such students, a function Clarke was unable to perform. In other words, Clarke was not "otherwise qualified" to teach.[4] Accordingly, we hold the School District was not required to accommodate Clarke in the manner he requested.

## V

Although the School District was not required to accommodate Clarke in order to permit him to remain in a *teaching position,* the question remains as to whether the School District was required to attempt to accommodate

---

[4]The School District's Assistant Superintendent examined Clarke's education and experience and testified that Clarke was unqualified for the teaching positions he contended he could perform. As noted by the Court of Appeals, "[w]ithout doubt, the question of the relative qualifications of teachers is one professional educators have more expertise in analyzing than do members of the judiciary." *Arnim v. Shoreline Sch. Dist. 412,* 23 Wn. App. 150, 156, 594 P.2d 1380, *review denied,* 92 Wn.2d 1022 (1979). We decline to substitute our judgment for that of the District's Assistant Superintendent.

Clarke by considering him for transfer to a *nonteaching position.*

*Dean v. Metropolitan Seattle,* 104 Wn.2d 627, 708 P.2d 393 (1985) is this court's most recent case dealing with the duty to accommodate a handicapped employee by transfer. Dean, a former bus driver who had lost sight in one eye, sought damages for handicapped discrimination based on Metro's failure to notify him of, or consider him for, jobs within the business for which he was qualified. This court held that Metro had failed to reasonably accommodate Dean's handicap and that Dean had made out a prima facie case of discrimination. *Dean,* at 639.

Recognizing that RCW 49.60.020 required a liberal construction of Washington's Law Against Discrimination, the court stated that Metro was required to "affirmatively assist the employee who becomes handicapped on the job." *Dean,* at 638–39 (citing *Holland v. Boeing Co.,* 90 Wn.2d 384, 389, 583 P.2d 621 (1978)). According to the court, Metro failed to make reasonable accommodation to Dean's handicap,

> in that Metro treated him as any other job applicant, did not determine the extent of his disability, did not . . . assist him in applying for other positions but left the initiative to him.

*Dean,* at 639.

The court stated that "reasonable accommodation" required Metro to take "affirmative steps to help him find another position." *Dean,* at 639. The court went on to hold that a handicapped employee makes out a prima facie case of handicap discrimination by proving:

> ▪ that he . . . is handicapped, [2] that he . . . had the qualification required to fill vacant positions and [3] that the employer failed to take affirmative measures to make known such job opportunities to the employee and to determine whether the employee was in fact qualified for those positions.

*Dean,* at 639.

Reduced to its essence, *Dean* stands for the following

propositions: First, the employer has no duty to create a job for a handicapped employee or to hire him in preference to a more qualified employee. *Dean,* at 634. Second, there is no discrimination in denying a job to a handicapped person who is unqualified to perform it. *Dean,* at 638. Third, if a handicapped employee is qualified for a job within an employer's business, and an opening exists, the employer must take *affirmative steps* to help the handicapped employee fill the position. *Dean,* at 639. Failure to satisfy the requirements of this third principle constitutes handicap discrimination in violation of RCW 49.60.180.

Applying these principles to the case at hand, it is clear that RCW 49.60.180 and WAC 162–22 do not necessarily prohibit the School District from discharging Clarke from his teaching position simply because he is handicapped, unless he is otherwise qualified to perform the essential functions of the job. Furthermore, *Dean* does not require the School District to create a position for Clarke for which he is not qualified, or to hire Clarke over a more qualified person. However, *Dean* does require the School District to take affirmative steps to help Clarke fill a position within the School District, if such a position exists and Clarke is qualified to fill it.

The hearing officer found that the School District did consider Clarke for teaching positions within the District, but that Clarke was not qualified to teach in the available positions due to his lack of academic training. This finding is not clearly erroneous given the substantial evidence on the matter in the record. As noted by the hearing officer, however, the record did not reflect whether it was the District's policy to consider persons such as Clarke for non-teaching positions. According to the hearing officer,

> [i]f that is the district's policy and appellant met all job–related qualifications for such non–teaching positions, the district would be required to take affirmative action to continue appellant . . . in a non–teaching capacity and make all reasonable accommodations to him in such a job . . .

Given the previous discussion of *Dean,* this conclusion accurately reflects the law in Washington, except to the extent the hearing officer made availability of a transfer to a nonteaching position dependent upon a School District policy. Policy or no policy, we believe the Law Against Discrimination, RCW 49.60.180, as interpreted by this court in *Dean,* requires the School District to transfer Clarke to a nonteaching position, if such a position exists and Clarke is qualified to perform it. Because Clarke has not yet sought a nonteaching position with the School District, he has established no discrimination under *Dean.* The issue was left unresolved in the hearing officer's decision, and we conclude it is still open should Clarke choose to seek a nonteaching position. With this clarification, the judgment of the hearing officer is affirmed.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.